IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SALADWORKS, LLC, <br><br>& <br><br>SW-FRUTTA BOWLS FRANCHISING CO., LLC <br><br>                 Plaintiffs, <br><br>    v. <br><br>KAYLESTER ENTERPRISES, INCORPORATED <br><br>& <br><br>Tamia Reese, Individually <br><br>                 Defendants. | Case No.   26-1542 <br><br>**VERIFIED COMPLAINT** |

**COMPLAINT**

1. This case arises out of a business dispute between Plaintiffs Saladworks, LLC and SW-Frutta Bowls Franchising Co., LLC (collectively, the "WOWorks Franchisors") and KayLester Enterprises, Inc. ("KayLester"), and Tamia Reese ("Reese") (KayLester and Reese, collectively, the "Franchisee"), the latter of whom are collectively a Saladworks and Frutta Bowls franchisee that has willfully rejected every opportunity to comply with its obligations under its franchise agreements with the WOWorks Franchisors. The WOWorks Franchisors now bring this suit to protect their proprietary franchise systems from damages caused by Franchisee's breaches of the franchise agreements, which include but are not limited to (i) Franchisee's failure to pay royalties and other fees due and owing to the WOWorks Franchisors under the franchise agreements, (ii) Franchisee's continued use and misappropriation of the WOWorks Franchisors'

1

federal registered trademarks, and (iii) Franchisee's operation of a competitive business at the premises of the franchised business, in violation of its noncompetition obligations under the franchise agreements.

## THE PARTIES

2.     Saladworks, LLC ("Saladworks") is an Illinois limited liability company with a principal place of business at 3135 1st Avenue N., Suite 15459, St. Petersburg, Florida 33733.

3.     SW-Frutta Bowls Franchising Co., LLC ("Frutta Bowls") is a Delaware limited liability company with a principal place of business at 3135 1st Avenue N., Suite 15459, St. Petersburg, Florida 33733.

4.     KayLester Enterprises, Incorporated is a Texas corporation with a principal place of business at 2205 Canterbury Drive, League City, Texas, 77573. Therefore, KayLester Enterprises, Incorporated is a citizen of Texas.

5.     Tamia Reese is an individual domiciled in and a citizen of the State of Texas. She is the CEO and President of KayLester, and a party to the Franchise Agreement.

## JURISDICTION

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338 in that plaintiffs' claims against Franchisee are based upon trademark and trade dress infringement under the Lanham Act, 15 U.S.C. §1051 et seq.

7.     Venue is appropriate in this forum because the WOWorks Franchisors and Franchisee are parties to a franchise agreement (the "Franchise Agreement") and affiliate product line addendum (the "Affiliate Addendum"), each dated February 28, 2022, copies of which are attached to this Complaint as **Exhibit A**. Pursuant to Section 18.3 of the Franchise Agreement, all

disputes and claims pertaining to the Franchise Agreement are to be litigated in the state or federal courts of Pennsylvania.

### THE FRANCHISORS

8.  The WOWorks Franchisors are in the business of granting qualified franchisees the right to own and to independently operate franchised restaurants under their proprietary registered trademarks and service marks (collectively, the "Proprietary Marks"), including but not limited to (a) with respect to Saladworks, the registered mark, "SALADWORKS," and (b) with respect to Frutta Bowls, the registered mark, "FRUTTA BOWLS," and in accordance with each respective WOWorks Franchisor's unique and proprietary business methods and system of operations (each a franchise "System," and collectively, the "Systems"). Saladworks has offered franchises under its Proprietary Marks and System since August 2015, and Frutta Bowls has offered franchises under its Proprietary Marks and System since March 2021.

9.  Saladworks' Proprietary Marks include, without limitation, the following marks that are registered on the Principal Register of the U.S. Patent and Trademark Office: (a) "SALADWORKS" (word mark), at Registration No. 1,693,647, first registered on June 9, 1992; (b) "Saladworks" (design mark), at Registration No. 5,019,072, first registered on August 9, 2016; and (c) "W" (design mark), at Registration No. 5,219,416, first registered on June 6, 2017.

10. Frutta Bowls' Proprietary Marks include, without limitation, the following marks that are registered on the Principal Register of the U.S. Patent and Trademark Office: (a) "FRUTTA BOWLS" (word mark), at Registration No. 7,417,547, first registered on June 18, 2024; and (b) "FRUTTA BOWLS" (design mark), at Registration No. 5,184.834, first registered on April 18, 2017.

11.     Because Saladworks and Frutta Bowls are affiliated companies owned by the same parent company, the WOWorks Franchisors may license certain of their franchisees to own and operate certain "co-branded" restaurants, which feature menu offerings of both the Saladworks and Frutta Bowls restaurant systems.

## THE FRANCHISE AGREEMENTS

12.     Saladworks and Franchisee are parties to (i) a Franchise Agreement dated February 28, 2022, pursuant to which Franchisee was granted the right and undertook the obligation to develop, open, and operate a Saladworks franchised restaurant (the "Franchised Business") located at 2700 Marina Bay Dr., Suite P, League City, Texas 77573 (the "Premises"), and (ii) an affiliate product line addendum (the "Affiliate Addendum"), pursuant to which Franchisee acquired the right to offer and sell Frutta Bowls menu items at and from the Franchised Business. The initial term of the Franchise Agreement is for a period of ten (10) years, commencing upon the date on which the Franchised Business was opened. See Ex. A at § 2.1. Like all of Saladworks' franchisees, Franchisee is required to operate the Franchised Business in accordance with Saladworks' prescribed systems of operation and with Saladworks' confidential operations manual (the "Manual"), including but not limited to by offering and selling from the Franchised Business "only those services and products which Franchisor prescribes," and by operating the business "in such a manner that will serve to emulate and enhance the image Franchisor intended for the System in order to maintain the highest operating standards, achieve system-wide uniformity and increase the demand for products sold and services rendered by System franchisees." See Ex. A at §§ 7.9 and 7.21).

13.     Pursuant to Section 7.7 of the Franchise Agreement, Franchisee was required to obtain the written approval of Saladworks prior to opening the Franchised Business to the public.

The reason for this contractual requirement is that Saladworks typically undertakes certain pre-opening activities on behalf of its franchisees, including sending one (1) or more representative(s) to a franchised business to prepare for the opening, ensure restaurant management is properly trained and ready for the opening, and to conduct final checks of the business's operating assets, including its hardware and software systems. See Ex. A at § 7.7

14. Pursuant to Section 3.2 of the Franchise Agreement, Franchisee is required to pay Saladworks a weekly royalty fee equal to 6% of "Net Sales," as defined in the Franchise Agreement. Franchisee is also required to report its Net Sales revenue to Saladworks on a weekly basis, and to maintain accurate books and records and permit Saladworks to inspect and/or audit Franchisee's business records. See Ex. A at §§ 3.3 and 11.

15. Pursuant to Section 12.2 of the Franchise Agreement, Franchisee is required to contribute to a marketing fund administered by Saladworks for the benefit of the franchise System (the "Brand Fund"), in the amount of three percent (3%) of Net Sales for duration of the term of the Franchise Agreement. See Ex. A at § 12.2.

16. In addition to the above-described payment obligations, Franchisee is required (like all Saladworks franchisees) to purchase and to utilize certain computer hardware and software programs in the operation of the Franchised Business, for the purposes of (i) promoting and maintaining System uniformity, and (ii) to enable Saladworks to monitor and to independently retrieve and verify the sales data of the Franchised Business so that Saladworks may accurately calculate the amount of Royalty and Brand Fund payments to which it is due. Specifically, Section 7.12 of the Franchise Agreement provides that Franchisee "shall purchase and use **any and all computer software programs ("Software")** which Franchisor has developed or may develop and/or designate for use for the System, and shall purchase such computer hardware as may be

necessary for the efficient operation of the Software, including without limitation, **a point-of-sale electronic cash register system** and credit card machine." See Ex. A at § 7.12 (emphasis added).

17. Section 15 of the Franchise Agreement (and its subsections) provide Saladworks the right to terminate the Franchise Agreement under certain conditions. For example, and without limitation, Saladworks is entitled to terminate the Franchise Agreement upon written notice, and without providing an opportunity to cure, in the event that (1) Franchisee offers any unauthorized or unapproved products at or from the Franchised Business; (2) Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from suppliers that Saladworks has not approved in advance; (3) Franchisee fails to pay as and when due any sums owed to Saladworks, any of its affiliates, or any of Saladworks' major suppliers or vendors, if such default remains uncured after fifteen (15) days; and (4) Franchisee fails to maintain the strict quality controls and standards reasonably required by the Franchise Agreement and/or the Operations Manuals, if such default remains uncured after fifteen (15) days. See Ex. A at §§ 15.2.14, 15.2.15, 15.3.1 and 15.3.4.

18. Upon termination of the Franchise Agreement for any default by Franchisee, Franchisee is required to pay to Saladworks "all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default" (Franchise Agreement, Section 16.4). Moreover, Section 16.5 of the Franchise Agreement provides that upon termination, Saladworks is entitled to collect liquidated damages from Franchisee

> "in an amount equal to: (a) the average weekly Royalty Fee and Brand Fund Contribution payable by Franchisee over the twelve (12) month period immediately prior to the date of termination (or such shorter time period if the Franchised Business has been open less than twelve (12) months); (b) multiplied by the lesser of (i) thirty-six (36) months or (ii) the number of months then remaining in the then-current term of this Agreement. Franchisee acknowledges that a precise calculation of the full extent of the damages Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult to determine and

that this lump sum payment is reasonable in light thereof. The liquidated damages payable by Franchisee pursuant to this Section 16.5 shall be in addition to all other amounts payable under this Agreement and shall not affect Franchisor's right to obtain appropriate injunctive relief and remedies pursuant to any other provision of this Agreement."

See Ex. A at § 16.5.

19. The Franchise Agreement provides that in the event of the termination of the Franchise Agreement for any reason, Franchisee is required to immediately undertake certain actions, among them: (1) Franchisee must cease immediately all operations under the Franchise Agreement ; (2) discontinue immediately the use of the Proprietary Marks; (3) immediately return to Saladworks the Operations Manuals and all other manuals and Confidential Information loaned to Franchisee; promptly make such changes as Saladworks may require to distinguish the appearance of the restaurant premises from System franchised businesses; (5) permit Saladworks to make final inspection of Franchisee's financial books and records; and (6) comply with the post-term covenants in Section 17 of the Franchise Agreement, including but not limited to the covenant prohibiting the post-term operation of a competitive business within a specified, limited geographic area. See Ex. A at §§ 16.1.1, 16.1.3, 16.1.4, 16.1.7, 16.1.11 and 16.1.12.

20. Pursuant to Section 17.2.2 of the Franchise Agreement, Franchisee is prohibited, for a period of three (3) years following the expiration or termination of the Franchise Agreement, from operating a competitive business (defined in the Franchise Agreement as a business "offering in whole or in part entrée salads, made to order salads, sandwiches, paninis, pasta, or any other services and/or products similar to or offered by Saladworks restaurants") either (a) at the Franchised Business premises, (b) within Franchisee's specified "Territory" (as defined in the Franchise Agreement), or (c) within a radius of ten (10) miles of the perimeter of such Territory. See Ex. A at § 17.2.2.

**FACTS GIVING RISE TO THE CLAIM**

21. Franchisee opened the Franchised Business to the public, without authorization by Saladworks as required under Section 7.7 of the Franchise Agreement.

22. As a result of Franchisee's unauthorized opening, Saladworks was (and remains) unable to determine whether management of the Franchised Business is properly trained and is conducting operations at the Franchised Business in accordance with Saladworks' System standards.

23. On or about May 23, 2025, Saladworks issued to Franchisee a written "Notice of Default and Demand for Compliance" (the "First Default Notice"), pursuant to which Saladworks informed Franchisee that it was in material default of the Franchise Agreement for the following reasons: (1) the Franchised Business had opened to the public without authorization; (2) the Franchised Business was operating without utilizing Saladworks' approved point-of-sale computer system, such that Saladworks had not been provided with any sales reports of the Franchised Business; (3) the Franchised Business was utilizing an unapproved menu board and was believed to have been offering unauthorized products and services from the Franchised Business; (4) the Franchised Business lacked required décor and branding elements, as required of all System franchisees; and (5) the cumulative effect of such defaults constituted conduct reflecting adversely on Saladworks' franchise System. A copy of the First Default Notice is attached hereto as **Exhibit B**.

24. On June 12, 2025, as a follow-up to the First Default Notice, Saladworks' counsel sent an email to Franchisee's counsel that identified a number of "concrete steps" that Franchisee could undertake (or begin to undertake) to establish compliance with its obligations under the Franchise Agreement, and indicated that it was Saladworks' strong preference to work directly

with Franchisee and its counsel to bring the Franchised Business into compliance with the Franchise Agreement.

25.     By return email dated June 24, 2025, Franchisee's counsel provided written response to the issues raised by Saladworks in its First Default Notice and follow-up email. Specifically, Franchisee's counsel explained that (1) Franchisee would reach out to Saladworks' representatives to address issues related to the Franchised Business's décor and menu boards; (2) Franchisee would provide current sales reports for the Franchised Business; and (3) Franchisee had previously completed Saladworks' initial training program and felt that further training was not required. In the same email, Franchisee's counsel explained that Franchisee had not arranged for the purchase and installation of Saladworks' required point-of-sale hardware system because Franchisee had concerns about certain terms of the standard contract provided by Saladworks' designated third-party service provider (the "POS Contract").

26.     In an effort to address and alleviate Franchisee's concerns with the third-party POS Contract, Saladworks' counsel on June 15, 2025, sent an email to Franchisee's counsel providing detailed explanations and answers to Franchisee's questions about the third-party POS Contract, as prepared by Saladworks' Chief Technology Officer.

27.     Saladworks waited weeks, which became months, for Franchisee to undertake (or even begin to undertake) any of the curative actions demanded by Saladworks to bring the Franchised Business into compliance with the Franchise Agreement. Copies of the above-described email exchanges between the parties are attached hereto as **Exhibit C**.

28.     On or around September 30, 2025, Saladworks issued to Franchisee a written "Final Notice of Material Default and Demand to Cure" (the "Final Default Notice"), which (i) set forth a summary of Franchisee's continued defaults under the Franchise Agreement, and (ii) provided

for an additional period of fifteen (15) days to cure such defaults, even though in light of the nature of the defaults and Franchisee's intransigence, Saladworks was not contractually required to provide such a cure period. A copy of the Final Default Notice is attached hereto as **Exhibit D**.

29. Franchisee never responded to the Final Default Notice.

30. On or around October 23, 2025, Saladworks issued to Franchisee a Notice of Termination of Franchise Agreement (the "Termination Notice"), pursuant to which Saladworks terminated the Franchise Agreement and Affiliate Addendum and demanded strict and immediate compliance with Franchisee's post-term obligations as set forth more fully therein (and as summarized above). A copy of the Termination Notice is attached hereto as **Exhibit E**.

31. Franchisee did not sign (and still has not signed) the required third-party POS Contract, nor otherwise installed the required point-of-sale system at the Franchised Business. Franchisee is using an alternative point-of-sale system at the Franchised Business to which Saladworks does not have access; as a result, Saladworks is unable to verify the sales data of the Franchised Business for the purpose of accurately assessing required Royalty and Brand Fund payments to which it is contractually due.

32. Since the opening of the Franchised Business, Franchisee has refused or otherwise failed to make **<u>any payments to Saladworks whatsoever</u>**, including but not limited to Franchisee's required Royalty payments and Brand Fund contributions.

33. Franchisee is still using outdated or otherwise unapproved menu boards and offering for sale at and from the Franchised Business certain unauthorized products that are not a part of either the Saladworks or Frutta Bowls franchise Systems. In addition to Saladworks' inability to independently access Franchisee's point-of-sale system to verify sales of such items, Saladworks is unable to determine (a) from where such unauthorized products are sourced, and (b)

whether their ingredients and preparation are in compliance with applicable health and safety regulations.

34. Franchisee never cured (and still has not cured) any of its material defaults under the Franchise Agreement.

35. At all relevant times, Saladworks has gone above and beyond its contractual obligations to independently resolve these matters with Franchisee, but Franchisee has refused at every turn to comply with its obligations under the Franchise Agreement, or even to work constructively with Saladworks to <u>begin taking small steps</u> to establish compliance with the Franchise Agreement.

36. Finally, and perhaps most egregiously, Saladworks has discovered that not only has Franchisee continued to operate the Franchised Business following the issuance of the Termination Notice (in violation of its post-term obligations under the Franchise Agreement), but Franchisee has at least partially "re-branded" the Premises, and intends to continue operating at the Premises under the trade name "Kay's Fresh Kitchen." A copy of a menu obtained at the Premises, which prominently features the address of the current Premises of the former Franchised Business, is attached hereto as **Exhibit F.**

37. Notwithstanding the above-described partial "re-branding" of the Premises, Franchisee continues to use and to display the registered trademarks of both Saladworks and Frutta Bowls in connection with Franchisee's operation of its business, including but not limited to on the exterior signage of the Premises.

38. Franchisee's apparent continued operation of a restaurant, at the Premises, and offering the same and similar menu items as its former Franchised Business, constitutes a blatant violation of Franchisee's post-term covenant prohibiting the operation of a competitive business

at the Premises, as well as infringement of both Saladworks' and Frutta Bowls' registered trademarks.

**COUNT I**
**BREACH OF CONTRACT**
**(Saladworks v. All Defendants)**

39. Saladworks incorporates the averments contained in Paragraphs 1-38 herein as if fully set forth in this paragraph.

40. The Franchise Agreement and Affiliate Addendum are valid and enforceable contracts under which the parties are obligated to perform.

41. Saladworks has complied with all of its obligations under the Franchise Agreement and Affiliate Addendum.

42. Franchisee breached the Franchise Agreement and Affiliate Addendum by:

   a. failing to install an approved POS system (Franchise Agreement, Section 7.12);

   b. failing to report when due sales and revenue data (Franchise Agreement, Section 10);

   c. failing to pay to Saladworks any royalty payments due under the Franchise Agreement (Franchise Agreement, Section 3.2);

   d. failing to pay to Saladworks the required Brand Fund contributions (Franchise Agreement, Section 12.2);

   e. failing to comply with Saladworks' standards and specifications for the appearance and operation of a franchised restaurant (Franchise Agreement, Section 7.21; Affiliate Addendum, Section 3);

    f.    failing to use Saladworks' Proprietary Marks in the manner authorized by the Franchise Agreement and Affiliate Addendum (Franchise Agreement, Section 4.1.1; Affiliate Addendum, Sections 3 and 8(ii));

    g.    failing to comply with its post-term obligations under the Franchise Agreement (Franchise Agreement, Section 16); and

    h.    failing to comply with its post-term covenant prohibiting the operation of a competitive business (Franchise Agreement, Section 17).

43. Franchisee was notified in writing of its defaults under the Franchise Agreement.

44. Although Franchisee was given opportunities to cure its defaults under the Franchise Agreement, it failed to do so.

45. As a result of the above-described material breaches of the Franchise Agreement, Saladworks had no other option but to terminate the Franchise Agreement. Saladworks has been damaged in an amount equal to the royalties due from the opening date of the Franchised Business through the date of termination, as well as liquidated damages, together with attorney's fees, interest, and costs.

## COUNT II
## BREACH OF CONTRACT – LIQUIDATED DAMAGES
**(Saladworks v. All Defendants)**

46. Saladworks incorporates the averments contained in Paragraphs 1-38 as if fully set forth in this paragraph.

47. The Franchise Agreement and Affiliate Addendum are valid and enforceable contracts under which the parties are obligated to perform.

48. Saladworks has complied with all of its obligations under the Franchise Agreement and Affiliate Addendum.

49. Section 16.5 of the Franchise Agreement provides for liquidated damages in the event of termination of the Franchise Agreement for any default by Franchisee.

50. Franchisee was notified in writing of its defaults under the Franchise Agreement.

51. Although Franchisee was given opportunities to cure its defaults under the Franchise Agreement, it failed to do so.

52. The Franchise Agreement was terminated due to the defaults of the Franchisee.

53. Due to Franchisee's breach, Saladworks is entitled to liquidated damages pursuant to Section 16.5 of the Franchise Agreement, in an amount to be determined at trial.

## COUNT III
## TRADEMARK INFRINGEMENT
### (All Plaintiffs v. All Defendants)

54. The WOWorks Franchisors incorporate the averments contained in Paragraphs 1-38 as if fully set forth in this paragraph.

55. The Franchise Agreement and Affiliate Addendum are valid and enforceable contracts under which the parties are obligated to perform.

56. Franchisee's rights to use the WOWorks Franchisors' Proprietary Marks were derived solely under the Franchise Agreement and Affiliate Addendum; upon the termination of the Franchise Agreement and Affiliate Addendum, Franchisee no longer has any right to use the WOWorks Franchisors' Proprietary Marks.

57. Franchisee continues to use the WOWorks Franchisors' Proprietary Marks in connection with the Franchised Business at the Premises, notwithstanding the termination of the Franchise Agreement and Affiliate Addendum, including in its exterior signage at the Premises of the Franchised Business, as depicted on **Exhibit G**.

58. Franchisee is liable for trademark infringement pursuant to the Lanham Act, 15 U.S.C. §1051, et seq. Franchisee's use of the WOWorks Franchisors' Marks constitutes a false designation of origin and is likely to cause confusion, mistake or deception as to its being affiliated, connected or associated with the WOWorks Franchisors in violation of 15 U.S.C. §1125(a). Franchisee's conduct is also a violation of the common law of unfair competition and is an unfair trade practice under common law.

**COUNT IV**
**BREACH OF CONTRACT**
**POST-TERM OPERATION OF COMPETITIVE BUSINESS**
(Saladworks v. All Defendants)

59. Saladworks incorporates the averments contained in Paragraphs 1-38 as if fully set forth in this paragraph.

60. Pursuant to Section 17.2 of the Franchise Agreement, Franchisee is prohibited, for a period of three (3) years following the expiration or termination of the Franchise Agreement, from operating a business that is competitive with the Franchised Business (a) at the Premises, (b) within its designated Territory, or (c) within a ten (10) mile radius of the perimeter of the Territory.

61. Saladworks lawfully and properly terminated the Franchise Agreement on October 23, 2025.

62. Franchisee is engaged in the operation of a competitive business at the Premises of the Franchised Business, in that Franchisee's purported new restaurant venture, "Kay's Fresh Kitchen," offers menu items that are substantially similar, or in some cases identical, to those authorized and offered under Saladworks' franchise System.

63. Saladworks has no adequate remedy at law in that its damages cannot be compensated with money. As a direct and proximate result of Franchisee's conduct, Saladworks has suffered and continues to suffer damage to its business, reputation and goodwill.

64. Saladworks' immediate and irreparable harm will increase unless and until Franchisee is enjoined from violating its post-term obligations.

65. A preliminary and permanent injunction is the only method by which Saladworks can prevent the further usurpation of its business system.

**WHEREFORE** Plaintiffs Saladworks, LLC and SW-Frutta Bowls Franchising Co., LLC demand judgment in their favor and against Defendants KayLester Enterprises, Inc. and Tamia Reese, jointly and severally, as follows:

a. A preliminary and permanent injunction enjoining Defendants and their agents, employees and any person or entity acting in concert with him from using the Proprietary Marks or any colorable imitation in any manner whatsoever;

b. An accounting of and judgment for the profits earned by the Defendants' infringement to which the Plaintiffs may be entitled;

c. Treble damages pursuant to 15 U.S.C. § 1117;

d. An order requiring the Defendants to deliver and/or destroy all labels, signs, prints, packages, wrappers, receptacles and advertisements in his possession bearing the words and/or symbols that are the subject of the trademark or trade name violation or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same pursuant to 15 U.S.C. §1118;

e. An accounting of the revenues generated by the Defendants since they started operating the restaurant and judgment in amount equal to the royalties and other fees due to the Saladworks under the Franchise Agreement and Affiliate Addendum through the termination date;

f. A judgment in amount equal to the liquidated damages as compensation for the lost future royalties due under the Franchise Agreement;

g. a judgment in amount equal to the attorney's fees and costs incurred in bringing this action pursuant to Section 22.9 of the Franchise Agreement and 15 U.S.C. § 1117; and

h. Such further relief as this Court deems just and proper

Dated:   March 12, 2026         Respectfully Submitted,

By: /s/ Barbara Gibson
Frank A. Reino, Esq.
Barbara Gibson Esq.
Fisher Zucker LLC
21 South 21st Street
Philadelphia, PA 19103
(215) 825-3100
Freino@fisherzucker.com
bgibson@fisherzucker.com

*Attorneys for Plaintiffs Saladworks, LLC & SW-Frutta Bowls Franchising Co., LLC*

## **VERIFICATION**

I, Alain Souligny, verify as follows:

1. I have read the Verified Complaint in this matter.

2. I am the Chief Financial Officer for the Plaintiffs, Saladworks, LLC, and SW-Frutta Bowls Franchising Co., LLC, and I have personal knowledge of the facts alleged in this complaint.

3. I verify under penalty of perjury the facts set forth in the verified complaint are true and correct.

**Dated**: March 12, 2026

_____
Alain Souligny